IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
December 6, 2004 Session

## BEATRICE HARMON MONTGOMERY v.
## TERRY LANE MONTGOMERY, ET AL.

Appeal from the Chancery Court for Carter County
No. 24258    Thomas J. Seeley, Jr., Judge

No. E2004-00403-COA-R3-CV  - FILED MARCH 17, 2005

While Beatrice Harmon Montgomery ("Plaintiff") and Terry Lane Montgomery ("Defendant") never married, they lived together for many years beginning in 1969. Plaintiff and Defendant had one child, Brian Montgomery. During their relationship, Plaintiff and Defendant accumulated substantial assets and operated several businesses. Plaintiff filed this lawsuit seeking dissolution of her implied business partnership with Defendant. Brian Montgomery intervened claiming he also was a partner in two of the business ventures. The Trial Court concluded that Plaintiff and Defendant were equal partners in all of their business pursuits, and that Brian also was a partner in two of them. It is this ruling that forms the basis for most of the numerous issues raised on appeal. We reverse in part, vacate in part, affirm in part as modified, and remand for further proceedings consistent with this Opinion.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed
in Part, Vacated in Part, and Affirmed in Part as Modified; Case Remanded

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., and SHARON G. LEE, JJ., joined.

Thomas C. Jessee, Johnson City, Tennessee, for the Appellant Terry Lane Montgomery.

David S. Haynes, Bristol, Tennessee, for the Appellee Beatrice Harmon Montgomery.

Mark D. Edmonds, Jonesborough, Tennessee, for the Appellee Brian Montgomery.

## OPINION

## Background

This appeal involves the complicated dissolution of what the Trial Court found to be an implied partnership between Plaintiff and Defendant, and at times also their only child, Brian Montgomery.[1] Plaintiff and Defendant are fifty-five years of age. They began living together in 1969 and their son Brian was born in 1970. Although they never married[2], Plaintiff and Defendant continued to live together for approximately twenty-seven years after Brian was born. In May of 1999, Plaintiff filed this lawsuit seeking a divorce or, alternatively, dissolution of an implied partnership.

The pleadings in the record comprise five volumes and 745 pages. It took several days to complete the trial and the transcript alone is over 1200 pages, excluding the 341 exhibits marked for identification of which 124 were admitted at trial. Once the trial was completed, the Trial Court orally announced many of its initial findings which later were transcribed and incorporated into the Judgment entered in May of 2003. This Judgment did not resolve all of the issues and, in addition, several post-trial motions were filed. In January of 2004, the Trial Court resolved the remaining issues as well as the post-trial motions with the entry of a Final Judgment, which later was amended in February of that same year. The Final Judgment altered few, if any, of the findings in the initial Judgment and focused primarily on how the parties were to go about selling or auctioning some of their assets.

This case involves the break-up of a long-term relationship between Plaintiff and Defendant. During their relationship, the parties acquired substantial assets. For example, at the time of trial the parties owned and operated a masonry business, an insurance business, a marina, a mini-mall, and an apartment complex known as Eastland Apartments. The parties owned various other business ventures during their relationship such as two Nautilus gyms. The primary issues at trial involved who was entitled to what. Because Plaintiff and Defendant never were married, the statutes and relevant case law addressing distribution of marital property did not apply. Relying on applicable precedent from our Supreme Court, the Trial Court applied the law governing business partnerships when rendering its Judgment. In short, the Trial Court concluded that Plaintiff and Defendant were equal partners in all of their business ventures with the exception of the marina and some land located across the road from the marina. With regard to these two assets, i.e., the marina

---

[1] Although Brian Montgomery is an intervening plaintiff in this lawsuit, any reference in this Opinion to "Plaintiff" refers only to Beatrice Montgomery.

[2] Plaintiff claimed she and Defendant had a valid common law marriage because they lived together in Florida for a sufficient amount of time to be considered married under Florida's then existing laws. Although Plaintiff advanced this and other theories in support of her argument that she and Defendant actually were married, the Trial Court found otherwise and this finding is not challenged on appeal. Nevertheless, during their relationship the parties held themselves out as being married and we note that the Trial Court referred to them as either Mr. or Mrs. Montgomery, or Terry and Bea Montgomery.

and the land, the Trial Court held that the parties' son Brian was also a partner. It is this overall conclusion by the Trial Court which forms the basis for most of Defendant's issues on appeal.

When the Trial Court announced its initial decision from the bench, it made certain credibility determinations and other findings which are important to the resolution of this appeal. Specifically, the Trial Court stated:

> As in most domestic type cases, credibility in this case was a key issue. The Court found Mr. Montgomery to be evasive and apparently forgetful throughout his testimony. He violated two injunctions of the Court, one … [prohibiting] the parties from disposing of any of their assets … and the injunction on June 28, 1999 … which said the parties were not to deny access to each other with respect to their various properties. Mr. Montgomery also illegally recorded Mrs. Montgomery's telephone conversations and … [he] filed what this Court found to be a spurious $1.6 million lien on the marina ….

> Mrs. Montgomery, on the other hand, was generally more forthright and candid in her testimony even when it was at times to her disadvantage. Mr. Montgomery did stipulate and agree to a partial division of their property as follows: Mr. Montgomery was to receive the houseboat and its contents and the masonry business. Mrs. Montgomery was to receive the condominium and its contents with the debt on the condominium to be paid from the proceeds of the sale of the marina, and she was to receive her insurance business. [Counsel for Mr. Montgomery] agreed these were the stipulated understandings between the parties as to these properties, but he did not stipulate that they were partnership properties. The Court finds that they are partnership properties, and in that connection, this Court would include the one-acre lot in Milligan, which was … used exclusively in the masonry business to be part of the masonry business.

> The Court finds and holds that the parties did combine their labor and monies until at least September, 1999. Mr. Montgomery contends that he did more in the way of monies and sweat equity to the acquisition of their various properties and monies. Mrs. Montgomery … contributed monies, and there were years earlier on in their relationship when she earned more money than Mr. Montgomery, and she also gave material assistance in the operation of both [of the Nautilus gyms … and] the Eastland Apartments, the masonry business where she did the record keeping and was active in

-3-

the operation of the marina prior to September, 1999. Her involvement in the development of the Florida properties was not as great as in some of the other businesses, *but it was a part of the overall scheme of these parties or goal of these parties to acquire assets and make substantial income…. The Court finds clearly under the facts of this case that Mr. and Mrs. Montgomery, Terry and Bea Montgomery were partners and that they did combine their labor, efforts, monies in the acquisition of properties and money….* (emphasis added)

There is considerable disagreement between the parties on appeal as to the Trial Court's conclusion as to when their business partnership actually began. The Trial Court stated in its Judgment that Plaintiff and Defendant "became equal partners in all of their business ventures beginning with the Masonry business in approximately 1981." Plaintiff claims the year should have read "1971" and this was merely a typographical error in the Judgment. Relying on the year as set forth in the Judgment (i.e., 1981), Defendant claims the Trial Court erred when it concluded Plaintiff was an equal partner in the masonry business, the Eastland Apartments, the Milligan lot, and certain land located in Florida. Alternatively, Defendant argues that if the finding of a partnership was correct, then he is entitled to recoup his initial investment of $180,000 in the Eastland Apartments prior to the parties dividing any remaining proceeds. Defendant also argues the Trial Court erred in finding Plaintiff to be a partner with regard to certain land titled in the names of Defendant and Brian Montgomery. Next, Defendant argues the Trial Court erred when it concluded Brian Montgomery was a partner with regard to the marina, and further erred in awarding Plaintiff and Brian Montgomery certain offsets and credits on their portion of the value of the marina. Defendant further argues that the Trial Court erred when it ordered the parties' property to be sold and divided in such a manner that did not allow Defendant to recoup his initial investments.

Separate and apart from any issues involving the claimed partnership and its assets, Plaintiff also claimed Defendant illegally wiretapped her telephone, thereby entitling her to statutory damages. The Trial Court held that Defendant had violated the applicable statute and awarded Plaintiff $10,000 in statutory damages. On appeal, Plaintiff claims there were three separate illegal wiretaps and, therefore, she should have been awarded $10,000 in damages for each violation, for a total of $30,000. Defendant argues that the Trial Court improperly awarded Plaintiff $10,000 in damages and claims that any award to Plaintiff for the illegal wiretap would constitute an abuse of discretion.

## Discussion

The factual findings of the Trial Court are accorded a presumption of correctness, and we will not overturn those factual findings unless the evidence preponderates against them. *See* Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). With respect to legal issues, our review is conducted "under a pure *de novo* standard of review, according no deference

to the conclusions of law made by the lower courts." *Southern Constructors, Inc. v. Loudon County Bd. Of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

"Generally, what will constitute a partnership is a matter of law, but whether a partnership exists under conflicting evidence is one of fact." *Messer Griesheim Indus., Inc. v. Cryotech of Kingsport, Inc.*, 45 S.W.3d 588, 605 (Tenn. Ct. App. 2001)(quoting *Wyatt v. Brown*, 39 Tenn. App. 28, 281 S.W.2d 64, 68 (1955)). Since there is no written partnership agreement between any of the parties to this litigation, the party alleging the existence of the partnership carries the burden of proving that fact by clear and convincing evidence. *See Tidwell v. Walden*, 330 S.W.2d 317, 319 (Tenn. 1959); *Kuderewski v. Estate of Hobbs*, No. E2000-02515-COA-R3-CV, 2001 Tenn. App. LEXIS 561, at ** 10-11 (Tenn. Ct. App. July 30, 2001), *no appl. perm. appeal filed*.

The Revised Uniform Partnership Act defines a "partnership" generally as "an association of two (2) or more persons to carry on as co-owners of a business or other undertaking for profit …." Tenn. Code Ann. § 61-1-101(6). Our Supreme Court provided further guidance in *Bass v. Bass*, 814 S.W.2d 38 (Tenn. 1991) when it stated:

> In determining whether one is a partner, no one fact or circumstance may be pointed to as a conclusive test, but each case must be decided upon consideration of all relevant facts, actions, and conduct of the parties. *Roberts v. Lebanon Appliance Service Co.*, 779 S.W.2d 793, 795 (Tenn. 1989). If the parties' business brings them within the scope of a joint business undertaking for mutual profit – that is to say if they place their money, assets, labor, or skill in commerce with the understanding that profits will be shared between them – the result is a partnership whether or not the parties understood that it would be so. *Pritchett v. Thomas Plater & Co.*, 144 Tenn. 406, 232 S.W. 961, 969-70 (1921).

> Moreover, the existence of a partnership depends upon the intention of the parties, and the controlling intention in this regard is that ascertainable from the acts of the parties. *Wyatt v. Brown*, 39 Tenn. App. 28, 281 S.W.2d 64, 67 (1955). Although a contract of partnership, either express or implied, is essential to the creation of partnership status, it is not essential that the parties actually intend to become partners. *Wyatt*, 281 S.W.2d at 67. The existence of a partnership is not a question of the parties' undisclosed intention or even the terminology they use to describe their relationship, nor is it necessary that the parties have an understanding of the legal effect of their acts. *Roberts*, 779 S.W.2d at 795-96. It is the intent to do the things which constitute a partnership that determines whether individuals are partners, regardless if it is their purpose to create or avoid the relationship. *Wyatt*, 281 S.W.2d at 67. Stated another way,

-5-

the existence of a partnership may be implied from the circumstances where it appears that the individuals involved have entered into a business relationship for profit, combining their property, labor, skill, experience, or money.

*Bass*, 814 S.W.2d at 41 (footnote omitted).

It is important to note that the statutory factors contained in Tenn. Code Ann. § 36-4-121(c) which are to be considered when dividing marital property do not apply in this case. In *Martin v. Coleman*, 19 S.W.3d 757 (Tenn. 2000), our Supreme Court affirmed a conclusion by the trial court that there was an implied partnership between Delores Coleman and Robert Coleman. The Colemans had been married and divorced. They later reunited and lived together unmarried for sixteen more years. The Supreme Court concluded that Mr. Coleman's retirement benefits were not part of the Colemans' business partnership and, therefore, were not partnership assets subject to division. In reaching this conclusion, the Court specifically refused to consider Ms. Coleman's contributions as a homemaker because such contributions were beyond the parties' business relationship. *Id.* at 761-62. Of course, if the Colemans had been married, Ms. Coleman's contributions as a homemaker indeed would have been relevant. *See* Tenn. Code Ann. § 36-4-121(c)(5).[3] The *Coleman* Court also refused to hold that unmarried couples could create an implied partnership simply by their "continued cohabitation." *Id.* *See also Story v. Lanier*, No. W2003-02194-COA-R3-CV, 2004 Tenn. App. LEXIS 761, at * 27 (Tenn. Ct. App. Nov. 17, 2004), *appl. perm. appeal pending*, ("While we are mindful of Ms. Story's contributions to the [domestic] relationship following this [business] transaction, we are directed to focus our attention upon the facts as they relate to the parties' decision to enter this particular transaction, not the facts as they relate to domestic matters.").

Our starting point is to decide whether the Trial Court concluded the partnership began in 1971 or 1981. After making the credibility determinations quoted earlier in this Opinion, the Trial Court made numerous findings of fact regarding, *inter alia*, the parties' various business ventures, the operation of these businesses over the years, as well as contributions to the business ventures by Plaintiff and Defendant and, when applicable, by Brian Montgomery. Even though many of the findings of fact often are duplicated, all in all they comprise approximately sixty-one (61) pages. The Trial Court's Judgment was well-considered and thorough. As noted previously, the Trial Court held that the parties' business partnership began with the advent of the masonry business. Along this line the Trial Court's first five of its many findings of fact regarding the masonry business are as follows:

---

[3] When equitably distributing marital property in a divorce case, Tenn. Code Ann. § 36-4-121(c)(5) requires a trial court to consider the "contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role."

In 1971, the decision that Terry become self-employed was joint, and Bea Montgomery began to participate in the masonry business as soon as Terry began to work as a self-employed person in 1971.

In 1973 Bea and Terry Montgomery entered into a business relationship for profit, combining their property, labor, skill, experience, and money. Terry and Bea began a masonry business as a self employment in Terry's name.

Bea was at that time earning more than Terry.

Bea Montgomery's work supplied the health insurance for all three through 1982.

Bea began to participate in the masonry business as soon as Terry Montgomery began to operate as a self-employed person in 1971 in that they opened a joint account for the masonry business in 1971.

Throughout the findings of fact and to the extent applicable, the Trial Court continued to reference pertinent events with regard to the parties' business ventures which had taken place prior to 1981. We believe it is clear that the Trial Court determined Plaintiff's and Defendant's partnership first began with the masonry business in 1971 and continued thereafter. Therefore, we agree with Plaintiff that the reference in the Judgment to the year when the partnership began as "1981" was indeed a typographical error and should have read "1971".

Defendant claims the Trial Court erred when it concluded he and Plaintiff were equal partners in: (1) the masonry business; (2) the Milligan lot; (3) the Eastland Apartments; (4) certain real estate located in Florida; and (5) land titled in the names of Defendant and Brian Montgomery and which is located across from the marina. With regard to the masonry business, we previously have set forth only the first five factual findings made by the Trial Court. Other factual findings detailing Plaintiff's contributions to the masonry business include, but are not limited to: Plaintiff handled the payroll account, paid the bills and signed all of the checks for the business, prepared the 1099's, handled the workers' compensation insurance, filed documents with the IRS including tax returns, handled the book keeping, made the deposits, collected the debts, and placed orders and handled the invoices. The Trial Court also found that Plaintiff never received any wages or a salary for her work in the masonry business. Instead, proceeds from the masonry business were deposited into savings and money market accounts which were joint accounts held in the names of both Plaintiff and Defendant.

In 1980, Plaintiff and Defendant purchased one acre of land for $2,500 using joint funds. Plaintiff's net earnings at that point in time were roughly $4,000 more per year than

Defendant's earnings.  The land was purchased from Defendant's cousin, Gene Lewis ("Lewis").
This land was titled only in Defendant's name even though joint funds were used for its purchase.
Plaintiff and Defendant discussed building apartments on this land and eventually decided to "take
on that venture." Defendant and Lewis began constructing the apartments in 1980.  In 1982, Lewis
wanted out of the apartment business.  Plaintiff and Defendant agreed to buy-out Lewis' interest,
which they did together.  Defendant continued to construct the apartments and in 1986 they were
completed and began to generate revenue.

Plaintiff was working for a credit company during the first year or two of the
construction of the apartments and her earnings were deposited into joint accounts.  Beginning in
1982 and continuing after construction on the apartments was completed, Plaintiff devoted much of
her efforts to another one of the parties' business ventures.  Specifically, Plaintiff operated and
managed the Elizabethton Nautilus gym.  Plaintiff also managed a second Nautilus gym located in
Johnson City during 1982 and a portion of 1983.  The Johnson City Nautilus gym was sold in 1983
for a net gain of approximately $37,000, of which over $26,000 was used to purchase Lewis' interest
in the apartment complex.  Plaintiff assisted in managing the apartments once they were completed.
Leases with tenants showed Plaintiff and Defendant as the lessors.  The lessees made their checks
payable to Plaintiff, who then deposited the checks into a joint account.  Plaintiff received no wages
or salary for her involvement with the apartments.

Much of Defendant's brief is devoted to comparing and contrasting the contributions
of each partner to the various business ventures.  We certainly agree with Defendant that the
contributions of the partners may be important when determining how much of an interest each
partner has in an implied partnership.  In the present case there was considerable disagreement over
the extent of the parties' contributions.  In resolving the conflicting testimony, the Trial Court made
specific credibility determinations and ultimately credited the testimony of Plaintiff and Brian
Montgomery over that of Defendant.  "Unlike this Court, the trial court observed the manner and
demeanor of the witnesses and was in the best position to evaluate their credibility." *Union Planters
Nat'l Bank v. Island Mgmt. Auth., Inc.*, 43 S.W.3d 498, 502 (Tenn. Ct. App. 2000).  A trial court's
determinations regarding credibility are accorded deference by this Court. *Id.*; *Davis v. Liberty
Mutual Ins. Co.*, 38 S.W.3d 560, 563 (Tenn. 2001).  In light of the foregoing, we are unable from
our review of the record to conclude that the preponderance of the evidence weighs against the Trial
Court's factual findings as to the quality and quantity of Plaintiff's contributions to the parties'
business ventures.

Having affirmed the Trial Court's factual findings as to Plaintiff's contributions, we
next consider whether the facts as found by the Trial Court support its conclusion that Plaintiff
proved by clear and convincing evidence that there was a partnership between her and Defendant and
that they were equal partners.  In support of his claim that the Trial Court erred in concluding
Plaintiff was a partner with regard to the businesses and assets at issue on appeal, Defendant again
focuses almost exclusively on each party's specific contributions to each particular business venture.
In so doing Defendant dramatically downplays Plaintiff's contributions and fails even to mention
many of the Trial Court's factual findings.  For example, when discussing Plaintiff's contribution

to the Eastland Apartments, Defendant states that "[a]t best" all Plaintiff did was "she ran some errands and collected some rent." We are puzzled by this characterization given that the land upon which the apartments were built was purchased with joint funds *and* Lewis' interest in the apartment complex was bought-out using funds from the sale of the Johnson City Nautilus gym which had been operated solely by Plaintiff.

Fortunately, we are not required to discuss each and every one of Plaintiff's and Defendant's contributions to each separate business venture. This is so because the Trial Court found there was *one* implied partnership between Plaintiff and Defendant with one goal, "to acquire assets and make substantial income." In other words, the Trial Court did not find that each particular business venture constituted a unique or separate partnership but rather that there was one partnership between Plaintiff and Defendant which had several business ventures as partnership assets. Since there was only one partnership with one collective goal even though this one partnership operated several businesses, it is not at all surprising that Plaintiff and Defendant devoted different amounts of time to the various businesses. Thus, while Defendant was busy constructing the Eastland Apartments, Plaintiff was busy operating one and for a period of time two Nautilus gyms. In fact, the Trial Court found that Plaintiff would begin working at the Elizabethton Nautilus at 7:00 a.m. and typically did not leave until 9:00 p.m. Plaintiff taught aerobics classes, etc., and when the gym was closed in the evenings, she did the necessary cleaning. When Plaintiff operated both Nautilus gyms, she alternated her time between the two facilities. The point being, the critical finding in this case is that both Plaintiff and Defendant devoted substantially equal amounts of time and effort to the partnership and to achieving its goal, not whether they devoted the exact same amount of time to each separate aspect or asset of the partnership.

As set forth in *Bass*, a partnership "may be implied from the circumstances where it appears that the individuals involved have entered into a business relationship for profit, combining their property, labor, skill, experience, *or* money." 814 S.W.2d at 41 (emphasis added). In the present case, it is clear to this Court, as it was to the Trial Court, that the parties entered into a business relationship for profit, and combined their property, labor, skill, experience, *and* money. We have discussed some but by no means all of Plaintiff's contributions to the partnership. After reviewing all of Plaintiff's contributions and the numerous other findings of fact detailed by the Trial Court, we affirm without hesitation the Trial Court's conclusion that Plaintiff proved by clear and convincing evidence that she and Defendant were business partners, that they were equal partners, that there was one partnership between Plaintiff and Defendant which involved all their various business pursuits, and that this partnership started in 1971.

The next issue is Defendant's claim that even if he and Plaintiff were business partners, the Trial Court nevertheless erred when it failed to allow him to recoup his initial investment of $180,000 in the Eastland Apartments. In making this argument Defendant relies upon an inception date of 1981 for when the partnership began, a position we have rejected. Defendant and Plaintiff agree that when the Eastland Apartments were completed in 1986, they were worth $180,000 and there was no corresponding debt. Defendant then claims that between 1981 and 1986, all Plaintiff did to assist with the apartments was "running errands." Taking that one step further,

Defendant then argues that since Plaintiff essentially did nothing between 1981 and 1986, the initial investment of $180,000 must somehow be all his and he is entitled to recoup that initial investment before any excess value is distributed.

We reject this argument for three reasons. First, once again Defendant overlooks Plaintiff's financial contributions to the apartment complex when the land was purchased with joint partnership funds and thereafter when the Johnson City Nautilus gym being operated only by Plaintiff was sold to buy-out Lewis' interest in this property. Second, when Defendant was devoting so much time and effort to the Eastland Apartments, Plaintiff was devoting an equivalent amount of time and effort to other partnership ventures. Third, the partnership began in 1971, not 1981, and Defendant has not shown that any part of his claimed initial investment was paid with non-partnership funds. This issue is without merit.

The next issue surrounds the marina and Defendant's claim that the Trial Court erred when it concluded Brian Montgomery also was an equal one-third partner in this business venture. Before we resolve this issue there are two points worth mentioning. First, Defendant does not challenge the Trial Court's conclusion that Plaintiff was a partner in the marina. Second, on appeal both Brian and Plaintiff ask this Court to affirm the Trial Court's finding that Brian was an equal one-third partner.

In the Judgment the Trial Court also made many findings of fact surrounding Brian Montgomery's contributions to the marina. Some of these factual findings are:

> It took approximately 3 to 4 years to get the approval from the TVA for the marina and the … effort for this and the paperwork and meetings were primarily with Bea. All of the contact with the TVA was done from the Elizabethton Nautilus office where Bea was managing.… Correspondence with TVA was handled through Brian and Bea. Terry, Brian and Bea went to the county court clerk and applied for the business license for the Marina. Business license for the Marina was listed in their 3 names. It was discussed and agreed that Bea, Terry and Brian would be partners from the beginning in the Marina. It was to be a family business.…
>
> Brian had finished 3 years at East Tennessee State, and decided he was interested in going away to chiropractic school.… Brian, Bea and Terry [later] decided to forgo the expense of chiropractic school and use those funds instead in developing the Marina.… Brian's plans changed after the conversations between Terry, Bea and Brian relative to the partnership in the Marina. Terry expressed that he hated to see Brian leave home to go to college.… Terry said to Brian, "What would it take to get you to stay here and manage the marina?" … Brian was told that he was to manage it and

become a partner in it.… Terry and Bea told him that they would be sharing the profits with him. The improvements and the buildings were all a joint efforts (sic) between Brian and Terry and Bea. (citations to the trial record omitted)

In addition to the foregoing, the Trial Court also found that Brian and his wife, Sherry, lived primarily at the marina and took responsibility for running the day to day operations. Brian and Sherry also purchased equipment for the marina, including $18,177.28 for a John Deere 955 tractor, and $7,800 for a John Deere 755 tractor. Brian also marketed the marina at boat shows and hosted boat shows at the marina.

For the same reasons set forth earlier, including the fact that credibility determinations significantly impacted the Trial Court's findings, we are unable to conclude that the preponderance of the evidence weighs against these factual findings by the Trial Court. Likewise, we further affirm the Trial Court's finding that Brian Montgomery proved by clear and convincing evidence that he was a one-third partner in the marina, with Plaintiff and Defendant each owning a one-third interest as well.[4]

Another asset at issue involves 33.3 acres of land located across the road from the marina. The Trial Court found this land was purchased by Plaintiff and Defendant for $50,000 using funds from their joint account. This land was titled in the names of Defendant and Brian Montgomery. The Trial Court concluded that Plaintiff and Defendant had an undivided one-half interest in this land, and Brian Montgomery had the remaining one-half interest. On appeal, Defendant challenges whether Plaintiff should be considered a partner in this asset. Since this land was purchased with Plaintiff and Defendant's joint funds and because the purchase took place well after the business partnership began in 1971, we readily hold that the Trial Court properly concluded that Plaintiff was a partner as to this asset as well. However, we believe the Judgment should be modified to reflect that Plaintiff, Defendant, and Brian Montgomery each own a one-third partnership interest in this property as they did in the Marina itself. We also believe the Judgment should be modified so that Plaintiff and Defendant are reimbursed for their initial investment of $50,000, with each of them receiving $25,000 prior to the remaining proceeds from the sale of this land being distributed equally among Plaintiff, Defendant, and Brian Montgomery. As modified, the Trial Court's conclusion with regard to this asset is otherwise affirmed.

Defendant's next issue is his claim that the Trial Court erred when it failed to apply the Uniform Partnership Act and allow him to be repaid his initial contributions to certain assets

---

[4] We note that the Trial Court also held that Plaintiff and Defendant were entitled to be reimbursed for their initial investment in the marina land and a "large metal building" located on the marina premises. These investments were made prior to Brian Montgomery becoming a partner and it was agreed that the value of these investments at the time they were made totaled $100,000. The Trial Court ordered Plaintiff and Defendant each to receive $50,000 from the sale of the marina prior to the remaining proceeds being divided one-third among each of the three partners. Our holding does not disturb this finding and resulting order by the Trial Court.

-11-

prior to any remaining proceeds being distributed among the partners. As we pointed out in footnote 4, *supra*, the Trial Court allowed Plaintiff and Defendant to recover their initial contributions to the purchase of the marina land and a "large metal building" prior to Brian receiving his one-third share. We also have modified the Judgment to allow Plaintiff and Defendant to recover their initial $50,000 investment in the 33.3 acres of land located across from the marina. Thus, at least with respect to the two assets where Brian was held to be a partner, Defendant has been allowed to recover his initial investments.

With regard to Defendant's partnership with Plaintiff, Defendant does not point us to anywhere in the record where it is shown that he made any initial contribution to the mini-mall or any other asset using funds that were not partnership funds. Contrary to Defendant's assertions in his brief, simply because a piece of property may be titled only in his name does not mean that partnership funds were not used to purchase that property or that it is not partnership property. As to the mini-mall, it was purchased in the early 1990's and the down-payment came from an agreement whereby rent paid for the Elizabethton Nautilus gym was to be applied toward this purchase. Thus, any initial investment clearly consisted of partnership assets and Defendant cannot claim any individual entitlement to these funds. The same result holds true for the marina as the record is replete with evidence establishing the funds used for this business venture were indeed funds of Plaintiff's and Defendant's partnership.

The next group of issues pertains to the several credits Plaintiff and Brian Montgomery were given against Defendant's one-third interest in the marina. Beginning in 1999, Defendant operated the marina without any assistance from Plaintiff or Brian. The Trial Court concluded that the marina partnership "terminated at that time. Whatever active income Terry Montgomery made from the marina the Court has found is his from that time on, and whatever active expenses he incurred are his." However, the Trial Court then stated that the "passive income" still was partnership property to be divided equally among the three partners, the passive income being the depreciation deduction for income tax purposes. Stated another way, the Trial Court held that even though the partnership in the marina technically had ended, the land, buildings, etc., were still partnership property and, therefore, the depreciation deductions for that land and buildings, etc., should be divided among the partners. Because Defendant deducted on his tax returns the entire allowable depreciation, the Trial Court concluded Plaintiff and Brian were entitled to a credit. We agree with these conclusions up to this point. However, in determining the amount Plaintiff and Brian were entitled to receive as a credit, the Trial Court took the entire amount of depreciation deducted by Defendant for 1999 through 2001, then subtracted from that sum the total amount of income tax paid by Defendant for those years. The Trial Court then divided the resulting figure by one-third, holding that Plaintiff and Brian each were entitled to a credit in the amount of $65,600.

We disagree with the Trial Court's method of calculation because it has the effect of treating the depreciation as a dollar-for-dollar tax credit, as opposed to a deduction against taxable income. Therefore, we vacate these particular credits to Plaintiff and Brian as calculated by the Trial Court. The tax returns in the record show Defendant's total tax liability for 1999 through 2001 when he deducted from his gross income 100% of the depreciation. On remand, the Trial Court is

instructed to determine the amount of taxes Defendant would have paid had he deducted only one-third of the depreciation. The Trial Court then is to deduct from this sum the amount of taxes Defendant actually paid when he deducted all of the allowable depreciation. The resulting figure should represent the amount of taxes Defendant did not have to pay because he claimed the extra two-thirds of the depreciation. This sum is to be divided with one-half being a credit to Plaintiff, and the remaining one-half being a credit to Brian. We agree with the Trial Court that these credits should be taken against Defendant's interest in the marina which was sold for over $1.6 million while this appeal was pending.[5]

The Trial Court also determined that Defendant had misappropriated funds totaling $94,250. From this total, $27,000 was marina funds and the Trial Court ordered Defendant to re-pay Plaintiff and Brian $9,000 each as reimbursement for their one-third share of these misappropriated funds. The Trial Court determined that the remaining $67,250 was misappropriated from funds belonging to the partnership between Plaintiff and Defendant, and the Trial Court ordered an additional reimbursement to Plaintiff of $33,625. Defendant challenges the Trial Court's order regarding these credits, claiming simply that this money was lost in a bad investment for which all of the partners must share.

We disagree. Describing the loss of the $94,250 as a "bad investment" is a significant understatement, to say the very least. The facts show that the $94,250 was given by Defendant to his brother, Rev. Larry Montgomery, who operated the Greater Ministries International Church of Tampa. The Trial Court found the Greater Ministries Church was "just patently a pyramid scheme" and further determined that Rev. Montgomery's credibility was even worse than Defendant's. In short, the Trial Court concluded these "donations" were "nothing more than a spurious scheme by Terry Montgomery and his brother to keep monies and assets from any claim of Beatrice Montgomery."

Defendant states in his brief:

Beatrice Montgomery should not be allowed to benefit from the good investments made by Terry Montgomery but not suffer the losses made in the bad investments. The Uniform Partnership Act makes all parties equally liable for debt or claims chargeable to the partnership.

We agree with Defendant's general proposition that partners are responsible for debts properly chargeable to the partnership. However, the Trial Court did not find that Defendant simply made a bad investment. The Trial Court found Defendant and his brother engaged in fraudulent conduct in an attempt to hide partnership assets from Plaintiff. In order for us to alter the Trial

---

[5] By way of example *only*, let's assume Defendant's total tax liability for the three years at issue was $25,000 when he deducted 100% the depreciation. Let's also assume that if Defendant had only deducted one-third of the depreciation, his total tax liability for the three years would have been $60,000. In this hypothetical situation, Defendant saved $35,000 by deducting the extra two-thirds of the depreciation, and Plaintiff and Brian would each be entitled to a credit for one-half of the total savings, or $17,500.

Court's judgment with regard to the $94,250, Defendant would have to successfully argue either that the preponderance of the evidence does not support the Trial Court's factual findings, or that the partnership and its partners nevertheless should be responsible for missing funds resulting from Defendant's fraudulent conduct. Defendant makes neither of these arguments, successfully or otherwise, and cites us to no authority which would support such a position. Therefore, we affirm the Trial Court's judgment with regard to the $94,250.

Prior to the trial, Defendant cashed in a life insurance policy for $15,000. The Trial Court found this to be a violation of one of its previous orders and held that the $15,000 should be considered partnership assets of Plaintiff and Defendant. Accordingly, the Trial Court gave Plaintiff a credit of $7,500 against Defendant's share of the proceeds from the sale of the marina. We fail to see how Defendant's purchase of a life insurance policy, or cashing in such a policy, can properly be considered as part of his business partnership with Plaintiff. Defendant's life insurance policy would be akin to the retirement benefits in *Martin v. Coleman*, *supra*, which were held by the Supreme Court not to be part of the business partnership of the Colemans who had lived together for sixteen years. Therefore, we reverse the Trial Court's conclusion that Plaintiff is entitled to a credit of $7,500 based on Defendant cashing in his life insurance policy.

The final issue involves Defendant's alleged illegal wiretaps in violation of Tenn. Code Ann. § 39-13-601. In its Judgment, the Trial Court pointed out that Defendant admitted to this activity once but it "appeared" to the Trial Court to have occurred on three occasions. The Trial Court awarded Plaintiff $10,000 in statutory damages.

We have reviewed the evidence, including Plaintiff's testimony, concerning these three incidents. With regard to the first incident, Plaintiff stated she found a tape recorder and "if one of us wasn't there to answer the telephone, the messages were recorded." As best we can tell, all Defendant was doing was recording messages. The third incident, however, clearly involved the hidden recording of conversations, not just recording messages. It is unclear from the evidence whether the second violation merely recorded messages, or also recorded conversations. Based on the foregoing, we conclude that Plaintiff proved only one violation of Tenn. Code Ann. § 39-13-601. Civil damages under this statute include actual damages or "[s]tatutory damages of one hundred dollars ($100) a day for each day of violation or ten thousand dollars ($10,000), whichever is greater" plus attorney fees and costs. *See* Tenn. Code Ann. § 39-13-603(a)(1). On appeal, Defendant argues that the Trial Court abused its discretion in awarding Plaintiff $10,000 in damages. Unfortunately for Defendant, the Western Section of this Court recently issued its opinion in *Robinson v. Fulliton*, 140 S.W.3d 312 (Tenn. Ct. App. 2003). In *Robinson*, we held that when actual damages are less than the statutory damages of $10,000, a trial court is "required to award … the $10,000 statutory damages at a minimum." *Id*. at 324. In any event, we would not find an abuse of discretion by the Trial Court in awarding this $10,000. Therefore, we affirm the Trial Court's award to Plaintiff of damages in the amount of $10,000 for the Defendant's single violation of Tenn. Code Ann. § 39-13-601.

## Conclusion

The Judgment of the Trial Court is reversed in part, vacated in part, and affirmed in part as modified. This cause is remanded to the Trial Court for further proceedings consistent with this Opinion and for collection of the costs below. Exercising our discretion, costs on appeal are taxed one-third against the Appellant Terry Lane Montgomery and his surety, one-third against the Appellee Beatrice Harmon Montgomery, and one-third against the Appellee Brian Montgomery.

_____
D. MICHAEL SWINEY, JUDGE