IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 3, 2020 Session

## SHARON KAY STORY, ET AL. v. MARK STEVEN MEADOWS, ET AL.

**Appeal from the Chancery Court for Davidson County**
**No. 14-1685-II      Anne C. Martin, Chancellor**

_____

### No. M2019-01011-COA-R3-CV

_____

This appeal concerns a dispute over ownership of two corporations and five limited liability companies, operating as Nashville Ready Mix.   The ultimate issue on appeal is whether the Trial Court erred by granting summary judgment in favor of the defendants, Mark Steven Meadows; Nashville Ready Mix, Inc.; Nashville Ready Mix of Murfreesboro, Inc.; Nashville Ready Mix of Columbia, LLC; Nashville Ready Mix of Franklin, LLC; Nashville Ready Mix of Clarksville, LLC; Nashville Ready Mix of Dickson, LLC; and Nashville Ready Mix of West Nashville, LLC (collectively, "Defendants").  The plaintiffs in this action, The Meadows Community Property Trust and Sharon Kay Story and Mary Helen Meadows, as co-trustees of Meadows Community Property Trust, (collectively, "Plaintiffs") appeal the Trial Court's grant of summary judgment in favor of Defendants and the dismissal of all their claims.  Determining that there are genuine issues of material fact that preclude summary judgment, we reverse the Trial Court's grant of summary judgment concerning the issues of statute of limitations, implied partnership, and accounting and remand for further proceedings.  Plaintiffs have waived the issues regarding unjust enrichment, constructive trust, and de facto merger due to their noncompliance with Tennessee Rule of Appellate Procedure 27 and Tennessee Court of Appeals Rule 6.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed in Part, and Reversed in Part; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and THOMAS R. FRIERSON, II, J., joined.

Thomas V. White, Robert L. Delaney, Lesa H. Skoney, Brandt M. McMillan, and Timothy N. O'Connor, Nashville, Tennessee, for the appellants, Sharon Kay Story and Mary Helen Meadows, in their capacity as co-trustees of Meadows Community Property Trust, and The Meadows Community Property Trust.

George Nolan and Paul J. Krog, Nashville, Tennessee, and C. Patrick Flynn, Brentwood, Tennessee, for the appellees, Mark Steven Meadows; Nashville Ready Mix, Inc.; Nashville Ready Mix of Murfreesboro, Inc.; Nashville Ready Mix of Columbia, LLC; Nashville Ready Mix of Franklin, LLC; Nashville Ready Mix of Clarksville, LLC; Nashville Ready Mix of Dickson, LLC; and Nashville Ready Mix of West Nashville, LLC.

## OPINION

## Background

Documentation shows that Mark Steven ("Steve") Meadows is the sole shareholder of Nashville Ready Mix, Inc. James Donald ("Don") Meadows and Mary Helen Meadows are Steve's parents. Pamela ("Pam") Meadows is married to Steve Meadows.[1] According to Plaintiffs, Don was illiterate. In the 1960s, Don Meadows began the company, Meadows Landscaping, of which he was the sole owner at that time. Both Don and Mary Helen worked in the business, and the business was successful. In 1974 after graduating from high school, Steve Meadows began working at the company as a full-time employee. The business became more profitable and continued to expand. While Don Meadows was the sole owner, he reported all profits and losses on his tax returns. In the late 1970s, the company began doing excavation work and became Meadows Excavating and Landscaping Company ("Meadows Excavating").

In 1986, after Steve had been working full time with the company for twelve years, Don and Steve became equal partners in Meadows Excavating, which was reflected on the 1986 income tax return for Meadows Excavating. Steve made no capital investment in the company at that time. When Steve became an owner of the company, both Don and Steve reported profits and losses on their tax returns. During 1986 and 1987, both Don and Steve were engaged in operating Meadows Excavating. Don also owned and operated a grocery store and a livestock business.

In September 1987, Steve Meadows and Joe Link entered into a written partnership agreement for Nashville Ready Mix. Don and Mary Helen had personally guaranteed loans taken out by Steve to begin Nashville Ready Mix. The Trial Court found that although the parents never had to pay on the loans they personally guaranteed, "a significant value" was added with their guarantees on the loans.

In May 1987, Don and Steve purchased real property at Baptist World Center Drive (formerly Whites Creek Pike) as a new location for Meadows Excavating. Meadows Excavating parked all its equipment on this site unless it was being used at a job site. Both

---

[1] For the sake of clarity, we often use first names in this opinion. No disrespect is intended.

Don and Steve had offices at that location. Nashville Ready Mix used this location for vehicle maintenance and parking since 1987. However, Steve denied that any other business operations of Nashville Ready Mix occurred at this location. According to Plaintiffs, Nashville Ready Mix operated its equipment out of this office but never paid rent. Meadows Excavating initially paid the mortgage on the Baptist World Center Drive property. At some point, Nashville Ready Mix began paying the mortgage for the Baptist World Center Drive property, as well as the utilities, maintenance, insurance, and property taxes associated with that property. Nashville Ready Mix never paid any rent for its operations out of this location until the Don and Steve's falling out in 2013, when it made one rent payment to Don for $9,000. Nashville Ready Mix also maintained a business office in a different location.

L. Gino Marchetti, Jr., was a lawyer who had performed work for Meadows Excavating, Nashville Ready Mix, Don and Mary Helen Meadows, and Steve and Pam Meadows. Mr. Marchetti represented both Don and Steve in personal matters and their business needs. The Trial Court found that Mr. Marchetti had "total knowledge about the structure, ownership, and changes of these entities over time." Mr. Marchetti described Don's role as "Mr. Inside" and Steve's role as "more Mr. Outside." According to Mr. Marchetti, Steve was a good businessman and knew how to take advantage of an opportunity, and Don would implement what Steve said and move forward with a plan. Mr. Marchetti explained that Don was "dealing with drivers and keeping the trucks running, plants operating and so forth, while Steve was out generating the business and talking with contractors and all that sort of stuff."

In October 1988, Nashville Ready Mix was converted to a for-profit corporation. Mr. Marchetti prepared the necessary documents, which stated that there were 2,000 shares of corporate stock with Steve Meadows and Joe Link each owning 1,000 shares. Steve bought Mr. Link's shares in August 1992, and Mr. Marchetti also prepared that paperwork. The transfer documents identified Steve Meadows and Joe Link as the only owners of Nashville Ready Mix, Inc. Steve and Nashville Ready Mix paid Mr. Link $185,000 with the source of those funds being a loan from First American Bank. The note was signed by Steve Meadows as president of Nashville Ready Mix, Inc.

Two experts hired by Plaintiffs, Rick V. Swafford, CPA/ABV, CVA, and Tonya L. Cherry, CPA/ABV/CFF, CFE, MACC, provided in their report that after Mr. Link left the company, six loans to Nashville Ready Mix were personally guaranteed by Don between 1992 and 1994, totaling over $1.8 million. In 1993 and 1994, Don and Mary Helen also had allowed real property they owned to be listed as collateral on two loans that were used to purchase the Murfreesboro and Mt. Juliet concrete plants.

David Hinton is a certified public accountant who had performed work for Don Meadows and Meadows Excavating from 1986 through 2013, as well as work for Steve

Meadows and Nashville Ready Mix since 1987. Mr. Hinton testified that Nashville Ready Mix, Inc., is a Subchapter S corporation, and they filed an 1120S return reflecting "the income and expenses, and the net profit or loss is reflected on a Schedule K-1, which is a part of that return." Mr. Hinton further explained that each shareholder receives a Schedule K-1 and that they include that on their personal tax return. According to Mr. Hinton, a Subchapter S corporation was not taxed at the entity level for federal income tax purposes. Mr. Hinson testified that Nashville Ready Mix, Inc. provided Steve Meadows a Schedule K-1, which reflected the company's profits and losses during each tax year. He further testified that the company had not provided a Schedule K-1 to Don Meadows and that Don had not requested a Schedule K-1. Mr. Hinton also testified that Steve Meadows was responsible for paying taxes on the profits of Nashville Ready Mix and that Don had never been responsible for paying those taxes. Don Meadows never suggested to Mr. Hinton that the profits and losses of Nashville Ready Mix should be included in his tax returns. Don had not reported ownership of Nashville Ready Mix on his tax returns or financial statements, and he had not informed Mr. Hinton of such ownership. Both Steve and Don had reported the ownership of Meadows Excavating on their tax returns and financial statements. Both had taken money out of the company on occasion, although Don did so more than Steve.

In March 1994, there was a lawsuit between Steve, Nashville Ready Mix, and Joe Link in the Davidson County Chancery Court. During that action, Gino Marchetti represented Nashville Ready Mix, Inc., and Steve, as the sole shareholder of Nashville Ready Mix, Inc., and had stated such to the Chancery Court. Also in 1994, Nashville Ready Mix had a dispute with the Metro Government of Nashville, and Mr. Marchetti represented to the individual with the Metro Government that Steve Meadows was the sole owner of Nashville Ready Mix. From 1994 through 1998, Nashville Ready Mix opened six new locations as either a corporation or LLC, including locations in Mt. Juliet in 1994, Murfreesboro in 1994, Columbia in 1996, Franklin in 1996, Clarksville in 1998, and Dickson in 1998. In March 2000, Nashville Ready Mix opened another new location in La Vergne. Mr. Marchetti drafted operating agreements concerning the LLC entities that reflected that Steve owned ninety-nine percent and Pam owned one percent of the Franklin and Dickson LLC companies. The operating agreement for Nashville Ready Mix of Columbia, LLC, reflected that Steve and Pam were the members of the LLC but stated in another place that Steve owned ninety-nine percent and Don owned one percent.

Pam Meadows, who previously worked as a bookkeeper for Meadows Excavating, testified during a deposition that Don and Mary Helen Meadows did not have a personal bank account and that all of their living expenses were paid directly from Meadows Excavating. Pam further testified that the majority of her and Steve's living expenses were paid by Meadows Excavating until they both began working full time at Nashville Ready Mix in 1994. After that, she and Steve paid for their living expenses through Nashville Ready Mix. Pam testified that Don and Mary Helen's living expenses were subsequently

paid by Nashville Ready Mix beginning in 2000 or 2002.  Pam further testified in a deposition that Don Meadows used blank, signed checks from Nashville Ready Mix's account to purchase cars, memorabilia, "stuff for his farm, parts for his tractor, just whatever he needed or wanted at the time" and that sometimes he would tell her in advance what he was purchasing but sometimes he would not.  According to Pam Meadows, the checks were used in the beginning to buy parts as needed but Don began using the checks for "personal reasons."  However, neither Don nor Mary Helen had check-signing authority on any Nashville Ready Mix account.

In 2000, Don and Mary Helen Meadows were placed on the payroll at Nashville Ready Mix and were paid salaries. Their salaries increased throughout the years.  In February 2002, there was a significant change in how Meadows Excavating operated.  It began limiting its operations and engaged in a transaction with Nashville Ready Mix.  Steve and Nashville Ready Mix argue that the change in 2002 was a "bailout" of Meadows Excavating due to a rapid decline in Meadows Excavating and its inability to make payroll and pay its bills.  Plaintiffs argue that Nashville Ready Mix and Meadows Excavating had merged.  During this time, Meadows Excavating continued operating, keeping a separate bank account, maintaining revenue, filing tax returns, owning property, and keeping its own books.  It made distributions to both Don and Steve.  It took depreciation on separately owned assets, including the vehicles.  However, Nashville Ready Mix took over the obligation on the notes and expenses for the vehicles owned by Meadows Excavating. Nashville Ready Mix also took over the drivers of the vehicles as Nashville Ready Mix employees and included the vehicles on Nashville Ready Mix's insurance policy.  At that time, Nashville Ready Mix stopped paying haul bills to Meadows Excavating.

Nashville Ready Mix opened a new location in West Nashville in 2004.  In May 2009, Meadows Excavating was converted to an LLC company.  A significant amount of money had been transferred from Nashville Ready Mix to an account labeled "Intercompany – Meadows."  The Trial Court classified this money as undocumented loans to Don Meadows.  However, Plaintiffs' experts concluded that this arrangement was Don sharing in the profits of Nashville Ready Mix throughout the years.  Mr. Swafford and Ms. Cherry's report stated that Don was permitted to spend the profits of Nashville Ready Mix on purposes including "personal utilities for the home and farm, home repairs on multiple properties and houses owned by Donald Meadows, farming expenses, expenses of the Halls grocery store, personal expenses such as cars, fencing, flea market spending, doctor bills for Don and various other family members, property taxes, insurance, etc."

In 2010, the Internal Revenue Service placed a tax lien on the personal residence of Steve and Pam for Nashville Ready Mix's profits, but according to Mr. Hinton, a tax lien was not placed on any property belonging to Don Meadows.  In 2013, Steve and Don had a falling out, and Don was expelled from Nashville Ready Mix.  In August 2014, Don and

Mary Helen set up a trust called the Meadows Community Property Trust, which did not involve Steve Meadows.

In December 2014, Don Meadows filed the complaint in the present action against Steve Meadows and the Nashville Ready Mix entities. Mr. Marchetti initially represented Don Meadows in this action. After a motion filed by Defendants seeking to disqualify Mr. Marchetti, the Trial Court disqualified him from representing Don Meadows in this action because he had represented Steve Meadows and Nashville Ready Mix in matters substantially related to this proceeding. Steve Meadows and Nashville Ready Mix filed an answer to the complaint and a countercomplaint.[2] An amended complaint was filed by Don in May 2015, followed by Defendants' amended answer.

Don Meadows subsequently died in February 2016, and representatives of his estate and the Meadows Community Property Trust were substituted as parties to this action in May 2016. The estate was dismissed as a party to this action. Sharon Kay Story and Mary Helen Meadows were co-trustees of the Meadows Community Property Trust. Plaintiffs filed a second amended complaint in November 2016, which included claims for an accounting, equitable estoppel, breach of implied contract, constructive trust, unjust enrichment, and de facto merger.

In April 2017, Defendants filed a "Motion for Summary Judgment Based Upon Statute of Limitations and Doctrine of Laches," requesting that Plaintiffs' claims of accounting, equitable estoppel, breach of implied contract, constructive trust, unjust enrichment, and de facto merger be dismissed as being barred by the applicable statute of limitations, pursuant to Tennessee Code Annotated § 28-3-109(a)(3), and by the equitable doctrine of laches. In June 2017, Plaintiffs filed a memorandum in opposition to the motion for summary judgment, stating that (1) granting summary judgment would require the Trial Court to draw both negative inferences and disputed facts against the nonmoving party, (2) there were genuine issues of material fact precluding summary judgment on this issue, (3) Defendants had not negated an essential element of Plaintiffs' claim, (4) the claims were filed within the prescribed statute of limitations period, (5) the doctrine of laches was not applicable, and (6) Plaintiffs had not had an opportunity to conduct adequate discovery in this matter. Also in June 2017, Defendants filed a reply in support of their motion for summary judgment, alleging that (1) Plaintiffs had relied upon "outdated information from witnesses who lack the requisite personal knowledge and foundational information required to make their testimony admissible," (2) the factual disputes were not material such to preclude summary judgment on this issue, and (3) Plaintiffs had not properly addressed Defendants' argument concerning the doctrine of laches.

---

[2] The countercomplaint filed by Defendants was pending in the Trial Court when this appeal was initiated and is not the subject of this appeal.

The Trial Court heard arguments in July 2017 concerning the summary judgment motion. The Trial Court subsequently entered an order denying the motion for summary judgment and incorporating its ruling from the verbatim transcript of the hearing. At the hearing, the Trial Court announced its ruling in court denying the motion for summary judgment. In its oral ruling, which was incorporated as part of its March 2018 order denying summary judgment, the Trial Court found that on the summary judgment issue concerning the statute of limitations and laches, "the plaintiffs as the nonmoving party have demonstrated the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party." The Trial Court found as follows in pertinent part:

> Here, the parties do not dispute that Don Meadows and Steve Meadows continued to work together at the Nashville Ready Mix businesses until March 2013, when Don Meadows became estranged from his son and was barred from the premises of Nashville Ready Mix. Up to that point, this Court finds that a reasonable person could assume that the business relationship between these two parties would amicably continue, that they would at some point amicably agree to a division of any ownership interest that exists, and in this -- standing in the shoes of Mr. Don Meadows, that he would have no need to initiate litigation to obtain the value of any contributions made to the partnership by Mr. Don Meadows because everything was going well. There was no problems. There was no reason for him to initiate litigation. This is particularly true in the context of a family situation where a father and son and other relatives are involved.

> In other words, this Court finds that up until that point, any partnership or contract that Don Meadows believed existed had not been terminated or been denied to exist by the defendant Steve Meadows. And this was the point, the turning point where Mr. Don Meadows would have realized that the current situation has changed and that Mr. Steve Meadows is asserting that Mr. Don Meadows has no interest in these businesses.

The Trial Court further found that because the burden of establishing that a partnership existed was with Plaintiffs and "to the extent that evidence is stale [and] witnesses are not available, this Court finds that that's going to prejudice the plaintiffs more than the defendants in this case." The Trial Court, therefore, entered an order in March 2018 denying Defendants' motion for summary judgment concerning the issues of the statute of limitations and the doctrine of laches.

A new chancellor was elected in 2018. Thereafter, four additional motions concerning summary judgment were filed. In February 2019, Defendants filed a motion for partial summary judgment concerning the claim for de facto merger, alleging that (1)

the doctrine of de facto merger is intended to apply to prevent debtors from defrauding creditors and that it is not applicable to the present case and (2) even if de facto merger applied, Plaintiffs cannot prove the basic elements of a de facto merger. Also in February 2019, Defendants filed a motion for partial summary judgment concerning Plaintiffs' claim for unjust enrichment, arguing that (1) there is no genuine issue of material fact as to the claim of unjust enrichment, (2) Plaintiffs presented no proof to demonstrate the value of any purported contributions Don made to Nashville Ready Mix, and (3) the "family-gift presumption" applies. Plaintiffs filed a response in opposition to those partial summary judgment motions, arguing that (1) genuine issues of material fact preclude summary judgment concerning both de facto merger and unjust enrichment, (2) evidence has established that Don "conferred a benefit on the defendants that they appreciated," (3) allowing Defendants to retain that benefit would be unjust if Don is not declared an owner of Nashville Ready Mix, and (4) genuine issues of material fact preclude the Trial Court's application of the family-gift presumption.

In March 2019, Defendants filed a motion for the Trial Court to revise its previous summary judgment ruling concerning the statute of limitations. Also in March 2019, Defendants filed a motion for partial summary judgment concerning Plaintiffs' claims of implied partnership, implied contract, and constructive trust, alleging that (1) Plaintiffs had not sufficiently pled the claim of implied partnership, (2) Tennessee Code Annotated § 61-1-202(b) precludes Plaintiffs from seeking an implied partnership, (3) Plaintiffs have presented no evidence concerning the value of Don's purported contributions made to Nashville Ready Mix to support an implied partnership or implied contract claim, (4) Plaintiffs presented no proof regarding the value of Don's contributions or losses to support their constructive trust claim. In April 2019, Plaintiffs filed a response in opposition to Defendants' motion, arguing that (1) Plaintiffs sufficiently pled "breach of implied contract, which is governed by the law of implied partnership," (2) Tennessee Code Annotated § 61-1-202(b) does not preclude a claim of implied partnership because Plaintiffs are not alleging that the Nashville Ready Mix entities are implied partnerships but that the implied partnership is between Don and Steve Meadows and the Nashville Ready Mix entities are assets to that implied partnership formed pursuant to common law, (3) implied partnership law does not require proof of the exact value of Don's purported contributions, (4) Plaintiffs' damages consist of the denial of Don's "rightful ownership interest," and (5) genuine issues of material fact preclude summary judgment on these issues.

On two separate dates in April 2019, the Trial Court conducted hearings concerning the summary judgment motions and took the matters under advisement. The Trial Court subsequently granted Defendants' motions for partial summary judgment concerning the claims of breach of implied contract or partnership, de facto merger, unjust enrichment, and constructive trust. The Trial Court also granted Defendants' motion to revise the Trial Court's previous ruling denying summary judgment based on the action violating the

statute of limitations. The Trial Court disagreed with the previous Chancellor's decision, vacated the previous decision, and ruled that Plaintiff's claims were untimely. The Trial Court, therefore, dismissed all of Plaintiffs' claims against Defendants.

In May 2019, the Trial Court issued its oral ruling, making findings of fact and conclusions of law. The Trial Court concluded as follows concerning the pending motions before the court.

> So first I'm going to deal with the implied partnership and implied contract claims. The first issue the defendant raised in its motion is that the plaintiffs did not plead an implied partnership and that the claim is barred. While implied partnership is not specifically pled, the Court reads the implied contract claim, which is set out in paragraph 53 of the second amended complaint, as being sufficient to meet the Rule 8 pleading -- notice pleading standard, and the Court does consider implied partnership to be pled as a claim.
>
> The Court also agrees that the standard -- the burden of proof is clear and convincing evidence as set out in the Story versus Lanier case, which is at 166 S.W.3d 167, and that's on page 175 of that case, which is a 2004 Court of Appeals case.
>
> The second issue that the defendant raises in his motion is that TCA 61-1-202(b) applies to bar the plaintiffs' claim that this business was part of a partnership and not a corporation. And essentially that statute says that you cannot disregard a corporate form otherwise recognized by the statutes for claiming a partnership. This is a 2001 statute, and it's based on the Uniform Partnership Act of 1997. And in the comments, the quote is, "Subsection (b) provides that business associations organized under other statutes are not partnerships. These statutory associations include corporations, limited partnerships, and limited liability companies. . . . That continues the UPA concept that general partnership is the residual form of for-profit business associations existing only if another form does not."
>
> There is no question in this case that Nashville Ready Mix has been a corporation since October 18th of '88 and that the individual satellite locations are LLCs. Based on the statute, the Court simply cannot disregard those forms to imply a partnership between Donald Meadows and Steven Meadows to own the Nashville Ready Mix entities.
>
> Now, the plaintiffs argue that all of the businesses together form a partnership and it's not a matter of just looking at the individual businesses, but that you

have to look collectively at the combination of businesses.  And they ask the Court to apply the statutory definition in TCA 61-1-202(c) and the language from the Tennessee Supreme Court's 1991 decision in Bass v. Bass.  And that case was prior to the Revised Uniform Partnership Act, but it uses similar language from 61-1-202(c), talking about people who place their money, assets, labor, or skill in commerce with the understanding that profits will be shared between them.

The Court appreciates the importance of that concept in the law and -- and really, as part of applying that, has to look at the equities.  And the Court simply cannot find the larger family implied partnership given the documents and the titles that clearly show the parties' intentions about ownership.

The trust owns the farm and the grocery.  The documents show that Excavating and -- the ownership of Meadows Excavating and Nashville Ready Mix is clear.  And, you know, the Court can't ignore that or turn the corporate law, the contract law on its head.  You know, applying the equities, as the Court sees it from these findings, the Court does not see a contribution of measurable value of time, energy, and resources from Donald Meadows such that he earned some sort of partnership interest in the Ready Mix entities.

The Court finds it significant that he was working under a W-2 arrangement, that Excavating was completely separate until 2002, and even then Donald Meadows became an employee of Ready Mix. Meadows Excavating continued as a separate entity.  Nashville Ready Mix took on the employees and paid for the trucks, the consideration for which was free hauling and ensuring that the debt personally guaranteed by Donald and Steven Meadows was paid.  Donald Meadows never got a K-1.  He was never responsible for taxes on the profits of Nashville Ready Mix.  He got W-2s for 14 or 15 years during his employment there.  And he knew the difference because he'd owned other businesses and he had received K-1s for other businesses.  The Court simply cannot disregard all that evidence regarding what the relationship was and what the parties knew or should have known their relationship to these entities was.

The Nashville Ready Mix satellite entities were owned by Steven Meadows or leased by Nashville Ready Mix.  That information was available to the world through the register of deeds office in terms of the properties.  And that's the reason that people have to file things with the register of deeds office; it puts people on notice on what the ownership is.

The Court also finds significant that all of these individuals and entities had the same lawyer drafting all these documents over all these years and just does not believe that that could not have been known.

Also, Meadows Excavating and Nashville Ready Mix kept separate bank accounts. They invoiced between them and had different property ownership. The financial information in the records supports the defendants' theory that Ready Mix bailed out Excavating in 2002. The Court looks at the decline in revenues in Excavating from $4.46 million in 1990 to 1.4 million in 2001 to a loss of $107,000 in 2000 and $151,000 in 2001. The trucks were never sold. They continued to be owned by Excavating. And Ready Mix assumed the overhead and the debt, but even -- even -- the -- the trucks have been sold in the context of one of the cases, which we'll talk about towards the end of this, but -- but, you know, that money is still being held and is still disputed as owned by both of the owners of Excavating. The Court simply cannot ignore the corporate and LLC documents or the formalities associated with those regarding ownership.

The plaintiffs argue that all of the businesses should be considered as one enterprise, but as Steven Meadows' counsel pointed out, that does not include exempted businesses such as the farm and the store. The Court found very convincing the quote "What's mine is mine and what's yours is mine." When the Court tries to look at all of this as a family enterprise, it appears that Donald Meadows thought he had the right to exempt out what he wanted to have exempted out but then wanted his part of this other business that he never paid taxes on, never took risk on, never reported on his financial reports or taxes, and -- and the Court simply can't ignore that.

And the position that the plaintiffs are taking is -- are very inequitable given the contributions of value and the distributions of profits and risk. The totality of the evidence must be considered, the tax returns, the financial statements, and the corporate documents, and they overwhelmingly support Steven Meadows' position that he is the sole owner of Nashville Ready Mix.

Thus, the plaintiffs' motion to dismiss the – I'm sorry, the defendants' motion to dismiss the plaintiffs' implied contract or implied partnership claims heard on April 18th of 2019 is granted. The Court finds that there is not an implied partnership or implied contract of ownership for Nashville Ready Mix between Donald Meadows and Steven Meadows. These entities were either corporations or limited liability companies whose corporate forms cannot be disregarded pursuant to Tennessee Code Annotated 61-1-202(b).

- 11 -

Additionally, the Court finds that the plaintiffs have not demonstrated with clear and convincing evidence that the combination of claimed business interests, including Nashville Ready Mix and Meadows Excavating, constitute an implied partnership between Donald Meadows and Steven Meadows. They were partners in Meadows Excavating pursuant to a written partnership agreement. Donald Meadows did not contribute measurable value to Nashville Ready Mix in terms of time, energy, or resources sufficient to create an interest. Moreover, applying the equities to the situation, he took more than he gave and left those businesses and his life owing Steven Meadows significant money through inequitable distributions from Meadows Excavating and monies loaned to him from Nashville Ready Mix.

So that's the implied partnership contract claim.

The next claim is unjust enrichment. The elements of unjust enrichment are set out in the Freeman Industries versus Eastman Chemical Company case, a 2005 Tennessee Supreme Court case found at 172 S.W.3d 512. Those elements are that a benefit was conferred, there was an appreciation of that benefit, there was an accepting of that benefit through an equitable retention without payment for value, and the benefit must be measurable. This is a quasi contract claim and is to be considered by the Court absent a contract otherwise.

The most significant requirement is the enrichment of the defendant be unjust, and that's set out at page 525 of the Freeman Industries case. There is no showing of a measurable benefit conferred by Donald Meadows for which he was not paid. He did -- he and – and Mary Helen Meadows guaranteed early loans to Steven and Pam Meadows so that Nashville Ready Mix could be funded. But the Court assumes and applies the family gift presumption. The loans were of limited amount given the total amount of debt and loans taken by the business over time. Donald Meadows was not obligated to repay the loans. The loans were also guaranteed by Steven and Pam Meadows, so they were a limited risk to Donald Meadows. He took more than he gave to Nashville Ready Mix. He borrowed and didn't pay taxes and didn't repay those loans. They can't go back and be reclassified as something else; estoppel would apply to -- to keep him from doing that. Any possible measurable contribution made by Donald Meadows was offset by Steven Meadows taking on liabilities and risks for the business. And the Court finds it significant, the tax liens and the amount of the tax liens and the fact that those were solely borne by Steven and Pamela Meadows.

- 12 -

Thus, the defendants' motion to dismiss the plaintiffs' unjust enrichment claim heard on April 12th, 2019, is granted. The Court finds that the plaintiffs have not met their burden that Donald Meadows conferred a measurable benefit upon Nashville Ready Mix and/or Steven Meadows for which there was unjust enrichment. On the contrary, applying the equities to the situation, Donald Meadows took more than he gave and left those businesses and his life owing Steven Meadows significant money through inequitable distributions from Meadows Excavating and monies loaned to him from Nashville Ready Mix.

The next cause of action the Court considered is the de facto merger. This is also an equitable doctrine that all the case law the Court could find is applied for creditors when debtors transfer assets, and they essentially transfer assets from a business and retain no assets and go out of business.

There's not a ton of case law on this claim. There's a 1913 Supreme Court case, Jennings, Neff & Company versus Crystal Ice Company, which is 159 S.W. 1088. There's a Sixth Circuit case that I believe Judge Echols decided, which is IBC Manufacturing Company versus Velsicol, V-E-L-S-I-C-O-L, Chemical Corp., which is at 187 F.3d 635. Those are the cases that discuss this doctrine the most.

The Court finds that this doctrine is not applicable for this purpose because it's already found that there's no partnership or unjust enrichment, so essentially there's no claim or creditor claim by Donald Meadows for which this equitable doctrine would apply. And the Court does not find any sort of merger between Meadows Excavating and Nashville Ready Mix. Again, the important facts the Court finds is that Meadows Excavating continued operations, kept separate bank accounts, had other customers, had revenue, Meadows Excavating continued to make distributions to Donald Meadows and Steven Meadows, continued to file tax returns, continued to take depreciation on separately owned assets, the vehicles. It was converted to an LLC after the 2002 events. It continued to own property and keep its books there, and as the Court has already said, the financial information provided supports the concept of the bailout theory rather than the merger theory.

Thus, the motion to dismiss the plaintiffs' de facto merger claim heard on April 12th, 2019, is granted. The Court finds that this equitable doctrine is not applicable to the situation because Meadows Excavating as the purported transferring company did not divest itself of all assets or go out of business, and any actions it did take was not to defraud Nashville Ready Mix. Rather,

- 13 -

the Court finds that the bailout scenario put forth by the defendant is what occurred, taking into consideration Meadows Excavating's lack of profitability, liabilities, and the cost to the owners to maintain operations and pay debts at the pre-2002 level.

The other two claims that have been made are claims for accounting and constructive trust, and as Mr. DeLaney discussed with the Court last time, those sort of follow from the ownership claim as mechanisms to determine interest. The Court finds that the plaintiffs are not entitled to an accounting of Nashville Ready Mix's businesses because Donald Meadows did not have any ownership in those entities prior to his death. This was an equitable remedy for preserving assets. The claim is thus moot. The summary judgment motion as to that claim is granted.

Similarly, regarding the constructive trust claim, the Court finds that the plaintiffs are not entitled to a finding that a constructive trust should be ordered to hold any of Nashville Ready Mix's or Steven Meadows' assets because Donald Meadows did not have any ownership interest in the Nashville Ready Mix entities prior to his death, nor does Steven Meadows owe him any money based on the Meadows Excavating and Nashville Ready Mix operations. A constructive trust is an equitable vehicle for preserving assets. That claim is moot, and summary judgment is granted on that.

The last issue the Court was asked to consider was the statute of limitations issue. And I put this one last because I struggled the most with this, because the Supreme Court specifically decided not to adopt a standard for contract cases and -- and summary judgment – I'm sorry, and statute of limitations in contract cases.

My predecessor on the bench had applied the Smith v. Hawk case, which is a 2015 Court of Appeals case, to look at the statute of limitations. And the standard in that case is when a plaintiff gains information sufficient to alert a reasonable person of the need to investigate the injury. There was a 2005 Court of Appeals case, Goot v. Metro - that was a breach of contract case, the Smith case was a tort case where that Court established a standard about knowledge when the breach of contract is inherently undiscoverable, essentially establishing a higher bar or a harder bar for people trying to apply the discovery rule to extend statute of limitations.

There was an older case, the Dietz v. Keith case, which is a 2000 Court of Appeals case, where the Court had applied the discovery rule to a contract case. In the Individual Healthcare Specialists case, which was the case from

- 14 -

the Supreme Court in January of this year, the Court specifically refrained from adopting the inherently undiscoverable standard from Goot but then found that it was a moot issue because that standard hadn't been met.

All of that to say is that it is unclear to this Court what standard it's supposed to apply. But the Court observes that under any of those standards, there is no way that Donald Meadows could not have known prior to six years from the filing of this lawsuit that there was a dispute about ownership. Any of those standards would -- one would expect him to have known.

And things that the Court finds significant are the fact that all of the parties and the entities had the same lawyer preparing this paperwork over the years. It took me some time to put that timeline together, but all that material came from the parties, and it is -- it is very clear what the parties' intentions were over the years. And he should have known that he was not considered an owner prior to six years prior to the filing of the lawsuit. Also, the fact that he was not getting K-1s or carrying ownership on his financial statements was significant to the Court. I never met Donald Meadows. I don't know how sophisticated or not sophisticated he was, but he had a lot of business interests going where there were different kinds of ownerships, and he was getting apparently good legal advice and good tax advice about how to treat all that, and – and certainly he should have known that if he wasn't getting a K-1, that he was not an owner.

So the Court finds that the statute of limitations would bar these claims anyway, because he should have known -- he should have known earlier that he didn't have an ownership interest. And any of these facts -- I mean, the Court looks at them all cumulatively, but there are plenty of facts prior to the -- prior to the start of a six-year period where he should have known that he wasn't an owner. So that is also a significant matter for the Court to consider.

So all of Donald Meadows' claims in 14-1685-11 are dismissed.

In June 2019, the Trial Court entered its written order granting Defendants' summary judgment motions, which adopted its oral ruling. Because Defendants' counterclaims were still pending, the Trial Court certified its judgment as final, pursuant to Tennessee Rule of Civil Procedure 54.02. Plaintiffs timely appealed to this Court.[3]

---

[3] In their reply brief on appeal, Plaintiffs rely on a demand letter written by Gino Marchetti in 2014. After briefing was completed on appeal, Defendants filed a motion to strike Part II(b)(1) of Plaintiffs' reply brief, alleging that the demand letter was inadmissible hearsay for purposes of summary judgment, that Plaintiffs had been precluded from questioning Mr. Marchetti about the letter due to attorney-client privilege, and that Plaintiffs had sought to rely on the letter for the first time in their reply brief. Plaintiffs have not raised

**Discussion**

Although not stated exactly as such, Plaintiffs raise the following issues for our review on appeal: (1) whether the Trial Court erred in its application of summary judgment law to the present case; (2) whether the Trial Court erred in its application of Tennessee law concerning implied partnerships and in its dismissal of the claims of unjust enrichment, constructive trust, estoppel, and accounting; (3) whether the Trial Court erred by granting Defendants' motion to revise the prior ruling of the Trial Court and granting summary judgment in favor of Defendants based on the statute of limitations; and (4) whether the Trial Court erred in its application of the law regarding de facto merger. Additionally, Defendants raise the following additional issue for review, which has been restated: (1) whether Plaintiffs waived the issues concerning unjust enrichment, constructive trust, estoppel, accounting, and de facto merger due to their failure to properly brief those issues on appeal.

A party is entitled to summary judgment only if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. In *Rye v. Women's Care Ctr. of Memphis, MPLLC*, our Supreme Court adopted the following standard when considering a motion for summary judgment filed by the party who does not bear the burden of proof at trial, as are Defendants in this case:

> [I]n Tennessee, as in the federal system, when the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense. . . . "[W]hen a motion for summary judgment is made [and] . . . supported as provided in [Tennessee Rule 56]," to survive summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading," but must respond, and by affidavits or one of the other means provided in Tennessee Rule 56, "set forth specific facts" *at the summary judgment stage* "showing that there is a genuine issue for trial." Tenn. R. Civ. P. 56.06. . . . [S]ummary judgment should be granted if the nonmoving party's evidence *at the summary*

the admissibility of the letter as an issue on appeal. To the extent that Plaintiffs include portions of this letter in their reply brief, we grant Defendants' motion to strike. We, however, need not and do not make any decision as to the admissibility at trial of this letter or Attorney Marchetti's testimony on the matters discussed in the letter.

- 16 -

*judgment stage* is insufficient to establish the existence of a genuine issue of material fact for trial. Tenn. R. Civ. P. 56.04, 56.06. . . .

477 S.W.3d 235, 264-65 (Tenn. 2015) (emphasis in original), *cert. denied,* 136 S. Ct. 2452, 195 L. Ed. 2d 265 (2016). "Whether the nonmoving party is a plaintiff or a defendant—and whether or not the nonmoving party bears the burden of proof at trial on the challenged claim or defense—at the summary judgment stage, '[t]he nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party.'" *TWB Architects, Inc. v. The Braxton, LLC*, 578 S.W.3d 879, 889 (Tenn. 2019) (quoting *Rye*, 477 S.W.3d at 265).

This court reviews a trial court's ruling on a motion for summary judgment *de novo* with no presumption of correctness, as the resolution of the motion is a matter of law. *Rye,* 477 S.W.3d at 250 (citing *Bain v. Wells,* 936 S.W.2d 618, 622 (Tenn. 1997); *Abshure v. Methodist Healthcare–Memphis Hosp.*, 325 S.W.3d 98, 103 (Tenn. 2010)). We view the evidence in favor of the non-moving party by resolving all reasonable inferences in its favor and discarding all countervailing evidence. *Stovall v. Clarke*, 113 S.W.3d 715, 721 (Tenn. 2003); *Godfrey v. Ruiz*, 90 S.W.3d 692, 695 (Tenn. 2002).

Respectfully, the Trial Court's decision to grant Defendants summary judgment reads much more like a decision after a trial rather than one resolving motions for summary judgment. To a large extent, the Trial Court in arriving at its decision focuses only on the evidence supporting the Defendants' motions. Further, the Trial Court appears to decide the weight of the evidence after making credibility determinations rather than determining whether the evidence creates a genuine issue of material fact. This approach by the Trial Court runs throughout its decision to grant Defendants' motions for summary judgment.

We first address whether the Trial Court erred by reconsidering its prior order denying summary judgment, entered by the previous chancellor, concerning the statute of limitations and granting Defendants' motion for summary judgment in favor of Defendants upon its finding that Plaintiffs' action was untimely. We note that the original order denying summary judgment was not a final order and could be reconsidered by the Trial Court at any time. *See Slaughter v. Duck River Elec. Membership Corp.*, 102 S.W.3d 612, 615 (Tenn. Ct. App. 2002). Such revision of a non-final summary judgment order will be overturned only when the trial court has abused its discretion. *Harris v. Chern*, 33 S.W.3d 741, 746 (Tenn. 2000). The Trial Court's decision to grant summary judgment, however, is a question of law, which is reviewed *de novo* with no presumption of correctness. We find no abuse of discretion by the Trial Court in its decision to rehear the motion for summary judgment on the statute of limitations issue.

The statute of limitations for breach of contract actions is six years. *See Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tennessee, Inc.*, 566 S.W.3d 671,

- 17 -

709 (Tenn. 2019). The parties agree that Tennessee Code Annotated § 28-3-109(a)(3) governs the statute of limitations in this action, which provides a six-year statute of limitations. This Court has held that "[a] cause of action for breach of contract accrues on the date of the breach or when one party demonstrates a clear intention not to be bound by the contract." *Coleman Mgmt., Inc. v. Meyer*, 304 S.W.3d 340, 348 (Tenn. Ct. App. 2009).

Defendants argue that events concerning the formation of Nashville Ready Mix, Inc., occurred from 1986 through 1988, which was twenty-six to twenty-eight years prior to the filing of Plaintiffs' complaint, and that the formation of the subsequent corporation and LLC companies occurred from 1993 through 2005, which was at least nine years prior to the initiation of this action. Defendants also aver that the "de facto" merger of Meadows Excavating and the Nashville Ready Mix companies allegedly occurred in 2002, which was twelve years prior to this action being filed by Plaintiffs. Defendant's argument focuses on the formation of Nashville Ready Mix and its various entities. However, we note that the cause of action would accrue at the breach of such implied contract or partnership or when a party demonstrates a clear intention to repudiate the contract, which from the evidence presented by the Plaintiffs could be as late as March 2013 when Don Meadows was ousted from the company. Since this is a summary judgment motion, facts must be taken in a light most favorable to the Plaintiffs.

The original Chancellor found that the parties continued working together until March 2013 when Don was banned from the Nashville Ready Mix property and that prior to that time, the alleged implied partnership between Don and Steve had not been terminated or repudiated by Steve and Nashville Ready Mix. The original Chancellor, therefore, denied the motion for summary judgment on this statute of limitations issue.

However, after revisiting the original judgment order denying Plaintiffs' motion for summary judgment, the Trial Court reversed the decision and found that Plaintiffs' cause of action accrued more than six years prior to the filing of their complaint no matter what method is utilized in determining when Plaintiffs' cause of action accrued. According to the Trial Court, "there is no way that Donald Meadows could not have known prior to six years from the filing of this lawsuit that there was a dispute about ownership." However, if the breach did not occur until March 2013, the current action which was filed in December 2014 would be timely as to all claims. The Plaintiffs presented proof supporting their position that the breach of contract or implied partnership did not occur until March 2013 when Steve barred Don from the premises of Nashville Ready Mix.

We agree with the decision of the first chancellor who held, for summary judgment purposes, that there are at least disputed issues of material fact as to when this alleged breach occurred. We, therefore, hold that a genuine issue of material fact exists as to when Plaintiffs' cause of action accrued that precludes summary judgment on this statute of limitations issue. Therefore, we reverse the Trial Court's grant of summary judgment in

- 18 -

favor of Defendants as to the issue of whether Plaintiffs' claims are barred by the prescribed statute of limitations.[4]

We next address Plaintiffs' issue concerning the claim of implied partnership. Tennessee enacted the Revised Uniform Partnership Act in 2001, and it went into effect in January 2002. Pursuant to the Revised Uniform Partnership Act, Tennessee Code Annotated § 61-1-202 (2018) defines a partnership as "the association of two (2) or more persons to carry on as co-owners of a business for profit . . . whether or not the persons intend to form a partnership." Our Supreme Court has provided still applicable guidance in *Bass v. Bass*, 814 S.W.2d 38 (Tenn. 1991) when it stated:

> In determining whether one is a partner, no one fact or circumstance may be pointed to as a conclusive test, but each case must be decided upon consideration of all relevant facts, actions, and conduct of the parties. *Roberts v. Lebanon Appliance Service Co.*, 779 S.W.2d 793, 795 (Tenn. 1989). If the parties' business brings them within the scope of a joint business undertaking for mutual profit – that is to say if they place their money, assets, labor, or skill in commerce with the understanding that profits will be shared between them – the result is a partnership whether or not the parties understood that it would be so. *Pritchett v. Thomas Plater & Co.*, 144 Tenn. 406, 232 S.W. 961, 969-70 (1921).
>
> Moreover, the existence of a partnership depends upon the intention of the parties, and the controlling intention in this regard is that ascertainable from the acts of the parties. *Wyatt v. Brown*, 39 Tenn. App. 28, 281 S.W.2d 64, 67 (1955). Although a contract of partnership, either express or implied, is essential to the creation of partnership status, it is not essential that the parties actually intend to become partners. *Wyatt*, 281 S.W.2d at 67. The existence of a partnership is not a question of the parties' undisclosed intention or even the terminology they use to describe their relationship, nor is it necessary that the parties have an understanding of the legal effect of their acts. *Roberts*, 779 S.W.2d at 795-96. It is the intent to do the things which constitute a partnership that determines whether individuals are partners, regardless if it is

---

[4] We cannot help but note that here two different Chancellors reviewed basically the same evidence on this issue and reached different results. This certainly supports our decision that a rational trier of fact could find in favor of Plaintiffs.

their purpose to create or avoid the relationship. *Wyatt*, 281 S.W.2d at 67. Stated another way, the existence of a partnership may be implied from the circumstances where it appears that the individuals involved have entered into a business relationship for profit, combining their property, labor, skill, experience, or money.

*Bass v. Bass*, 814 S.W.2d 38, 41 (Tenn. 1991) (footnote omitted).

Defendants and the Trial Court place a great deal of emphasis on the formation documentation of the corporations and LLC entities of Nashville Ready Mix. Such proof certainly is relevant, but as already detailed it was not the only proof submitted to the Trial Court on this issue. Tennessee Code Annotated § 61-1-201 provides that an association that has been formed under another statute other than the Revised Uniform Partnership Act "is not a partnership under this chapter." Just because an association has been formed under another statute means a partnership cannot be formed "under this chapter," that is the Revised Uniform Partnership Act, does not preclude absolutely the formation of a partnership by other means. Although *Bass v. Bass* was released in 1991 prior to the enactment of the Revised Uniform Partnership Act, we hold that the Revised Uniform Partnership Act does not preclude an existence of implied partnerships, such as that in *Bass*. In fact, Tennessee Code Annotated § 61-1-104 provides that unless displaced by provisions of the Revised Uniform Partnership Act, "the principles of law and equity supplement this chapter." As such, the common law principles of law and equity still apply concerning whether an implied partnership has been formed. This is certainly so when Plaintiffs alleged and submitted evidence that the implied partnership came into existence prior to the adoption of the Revised Uniform Partnership Act.

Further, Plaintiffs' claim is that the partnership between Don and Steve was a larger entity than the separate businesses and that it was the larger partnership entity between Don and Steve that owned Meadows Excavating and the Nashville Ready Mix entities. Plaintiffs point to the case of *Montgomery v. Montgomery*, 181 S.W.3d 720 (Tenn. Ct. App. 2005), for its proposition that a larger partnership existed between Don and Steve and that this larger partnership owned Nashville Ready Mix. The *Montgomery* Court cited to the Revised Uniform Partnership Act and also applied the holding in *Bass* to determine that an implied partnership existed between the parties. *Id.* at 726-30. The Court in *Montgomery* affirmed the trial court's finding that despite having several businesses, there was only one implied partnership between the parties which had one goal of acquiring assets and making substantial income. *Id.* at 729-30. This Court explained that "the Trial Court did not find that each particular business venture constituted a unique or separate partnership but rather that there was one partnership between Plaintiff and Defendant which had several business ventures as partnership assets." *Id.* at 730. The Court recognized that the critical finding was that the parties had devoted "substantially equal amounts of time and effort to the

- 20 -

partnership and to achieving its goal, not whether they devoted the exact same amount of time to each separate aspect or asset of the partnership." *Id.*

In this case, the Trial Court considered this argument but concluded that it could not "find the larger family implied partnership given the documents and the titles that clearly show the parties' intentions about ownership." Although we acknowledge that the formation documentation for the companies may be sufficiently persuasive following trial to find in favor of Defendants, the Trial Court placed too much emphasis on the documentation in the summary judgment phase and failed to consider the conflicting evidence in a light most favorable to the Plaintiffs. Although what is considered a partnership is generally a matter of law, whether a partnership exists under conflicting evidence is one of fact. *Id.* at 726 (quoting *Messer Griesheim Indus., Inc. v. Cryotech of Kingsport, Inc.,* 45 S.W.3d 588, 605 (Tenn. Ct. App. 2001) (other internal citations omitted). In this case, there is indeed conflicting evidence concerning whether an implied partnership existed between Don and Steve.

Plaintiffs argue that the larger partnership entity was formed between Don Meadows and Steve Meadows around the time that Nashville Ready Mix was first formed. Taking the facts in a light most favorable to Plaintiffs at this summary judgment stage, Don Meadows and Steve Meadows had agreed that Steve Meadows would be an equal partner in Meadows Excavating after employment with the company for twelve years. The 1986 tax return for Meadows Excavating reflects that Don made Steve a partner in Meadows Excavating some time in 1986. The 1986 tax return was not executed and filed until October 1987. According to the deposition of David Hinton, Don made Steve a partner in 1986 in order to receive a $50,000 tax benefit for the profits of Meadows Excavating. Nashville Ready Mix was formed in September 1987. According to Plaintiffs and their proof submitted at this summary judgment stage, the decision for Don to make Steve a partner in Meadows Excavating and the formation of Nashville Ready Mix happened closely in time and are interrelated.

According to Plaintiffs and their proof submitted to the Trial Court, not only had Steve gained "financial solvency" when he became a partner in Meadows Excavating, which allowed him to secure loans to begin Nashville Ready Mix, Don also had personally guaranteed the necessary loans. Plaintiffs further presented proof that Steve had received a $30,000 distribution from Meadows Excavating in order to form Nashville Ready Mix, and later that year Nashville Ready Mix received a loan of $10,000 from Meadows Excavating. Nashville Ready Mix was formed initially as a partnership, with Steve and his friend, Joe Link, as equal owners of the company. Nashville Ready Mix later became a corporation with Steve and Joe Link as equal shareholders.

In 1992, Nashville Ready Mix, Inc., began having financial difficulties as evidenced by a July 1992 letter to Steve and Mr. Link concerning two past due loans, as well as a

letter to Don demanding payment of the full amount of the loans for his guarantee of the loans. In August 1992, Steve bought out Mr. Link's shares in the corporation. Plaintiffs argue that Mr. Link's exit from Nashville Ready Mix was "precipitated by one bank's demand on Don Meadows's personal guarantees." Defendants, however, state that Don did not guarantee the loan to buy out Mr. Link and had not contributed any funds to the purchase of Mr. Link's interest in Nashville Ready Mix, Inc. Plaintiffs' experts provided in their report that after Mr. Link left the company, six additional loans to Nashville Ready Mix were personally guaranteed by Don between 1992 and 1994, totaling over $1.8 million. In 1993 and 1994, Don and Mary Helen also had allowed real property they owned to be listed as collateral on two loans that were used to purchase the Murfreesboro and Mt. Juliet concrete plants.

David Glasgow worked for Nashville Ready Mix as a mechanic about a year after they began the company and worked there for approximately four years. He left for a period of time and returned to Nashville Ready Mix in 2005 as a mechanic. According to Mr. Glasgow, he was hired after meeting with "Mickey and Don." Mr. Glasgow described Nashville Ready Mix as a "family run business." Mr. Glasgow acknowledged that he understood Steve owned Nashville Ready Mix but stated that he believed Don owned part of the company as well. Mr. Glasgow testified that Joe Link had instructed him to do whatever Don wanted or needed. According to Mr. Glasgow, no one had told him Don was an owner, but he assumed he was.

Attorney Gino Marchetti represented the parties in several personal and business matters. Mr. Marchetti prepared the documentation for the formation of Nashville Ready Mix. In the paperwork, Don was not listed as an owner of Nashville Ready Mix. In his deposition, Mr. Marchetti described Don's role in Nashville Ready Mix as "Mr. Inside" and Steve's role as "Mr. Outside," explaining that Don was "dealing with drivers and keeping the trucks running, plants operating and so forth, while Steve was out generating the business and talking with contractors and all that sort of stuff." The contributions Don Meadows made to the alleged partnership are a disputed issue of fact in this matter.

Another fact at issue concerns whether Don had shared in the income of Nashville Ready Mix. Pam Meadows testified that Don and Mary Helen Meadows did not have a personal bank account and that all of their living expenses were paid directly from Meadows Excavating. Prior to 1994, Meadows Excavating had paid the majority of Pam's and Steve's living expenses as well. After that, they began paying for their living expenses through Nashville Ready Mix. Beginning in 2000 or 2002, Don and Mary Helen's living expenses were paid by Nashville Ready Mix. Don Meadows also used blank, signed checks from Nashville Ready Mix's account to purchase cars, memorabilia, "stuff for his farm, parts for his tractor, just whatever he needed or wanted at the time" and that sometimes he would tell her in advance what he was purchasing but sometimes he would not. Pam Meadows testified that the blank checks were intended to allow Don to buy parts

as needed but that he began using the checks for "personal reasons." According to Plaintiffs, both Don and Steve paid for "all of their living expenses, including housing, *taxes*, vehicles, insurance, gas, food, farm operations, hobbies, etc. . . . from the business accounts of either Meadows Excavating or Nashville Ready Mix from about 1985 until 2013."

It is undisputed that Don did not report income from Nashville Ready Mix companies on his income tax returns while Steve had reported income from Nashville Ready Mix on his tax returns. However, Plaintiffs argue the proof shows that Don had indeed shared in the profits of Nashville Ready Mix or that it is at least a genuine issue of material fact. There is a question of fact concerning the transfers of money from Nashville Ready Mix to an account named "Intercompany – Meadows." The Trial Court classified approximately $2 million from Nashville Ready Mix to Don Meadows or Meadows Excavating as undocumented "loans." Those loans had no promissory notes to correlate with the amount transferred. Plaintiffs, however, argue that the $2 million was Don sharing in the profits of Nashville Ready Mix. This is yet another disputed issue of material fact.

Plaintiffs hired experts, Rick V. Swafford, CPA/ABV, CVA, and Tonya L. Cherry, CPA/ABV/CFF, CFE, MACC, who analyzed the ledgers at Nashville Ready Mix. Mr. Swafford and Ms. Cherry prepared a report concerning Nashville Ready Mix and stated that Don was permitted to spend the profits of Nashville Ready Mix on purposes including "personal utilities for the home and farm, home repairs on multiple properties and houses owned by Donald Meadows, farming expenses, expenses of the Halls grocery store, personal expenses such as cars, fencing, flea market spending, doctor bills for Don and various other family members, property taxes, insurance, etc." The experts opined that when Nashville Ready Mix transferred money to the "Intercompany – Meadows" account, that this arrangement appeared to be a profit-sharing arrangement for Don to share in the profits of Nashville Ready Mix.

The Trial Court applied the clear and convincing evidence standard at the summary judgment stage. *See Montgomery v. Montgomery*, 181 S.W.3d 720, 726 (Tenn. Ct. App. 2005) ("Since there is no written partnership agreement between any of the parties to this litigation, the party alleging the existence of the partnership carries the burden of proving that fact by clear and convincing evidence.") (other internal citations omitted). We note that although Plaintiffs argue this was error, a review of all the evidence in a light favorable to Plaintiffs, resolving all factual disputes and making all inferences in favor of Plaintiffs, a rational trier of fact could find that clear and convincing evidence existed at this summary judgment stage to support an implied partnership between Don Meadows and Steve Meadows. As such, we reverse the Trial Court's order granting summary judgment in favor of Defendants concerning this issue.

We next address Plaintiffs' issues concerning unjust enrichment, constructive trust, and de facto merger. Defendants argue that Plaintiffs have waived these issues on appeal due to their failure to fully brief them during this appeal. Plaintiffs responded in their reply brief, denying that they had waived any of their issues on appeal. Plaintiffs further state that they had explained in their brief the Trial Court's failure to consider their arguments or evidence on these claims and that they had "incorporated by reference all of [Plaintiffs'] detailed arguments as to why genuine issues of material fact preclude summary judgment on those specific claims, and provided pinpoint citations to the appellate record where those arguments, citations, and legal authorities can be found."

Tennessee Rule of Appellate Procedure 27(a)(7) requires an appellant to include an argument section in their appellate brief setting forth "the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on." Additionally, Tennessee Court of Appeals Rule 6(a) provides the following requirements of an argument on appeal:

> Written argument in regard to each issue on appeal shall contain:
>
> (1) A statement by the appellant of the alleged erroneous action of the trial court which raises the issue and a statement by the appellee of any action of the trial court which is relied upon to correct the alleged error, with citation to the record where the erroneous or corrective action is recorded.
>
> (2) A statement showing how such alleged error was seasonably called to the attention of the trial judge with citation to that part of the record where appellant's challenge of the alleged error is recorded.
>
> (3) A statement reciting wherein appellant was prejudiced by such alleged error, with citations to the record showing where the resultant prejudice is recorded.
>
> (4) A statement of each determinative fact relied upon with citation to the record where evidence of each such fact may be found.

In Plaintiffs' appellate brief, they include a headnote on their section concerning these issues stating as follows: "The trial court's ruling dismissing unjust enrichment, de facto merger, and constructive trust was also error." In addition to the headnote, Plaintiffs include four sentences of argument and a footnote directing this Court to the record below for their arguments concerning these issues. The section on these issues contains no supporting authority and the only citations to the record point to the arguments made by

- 24 -

Plaintiffs in the Trial Court. In addition to providing these citations to the record of their arguments, Plaintiffs attempt to incorporate by reference the arguments made before the Trial Court in order for them to be considered by this Court on appeal. Plaintiffs make no further argument on appeal concerning these issues.

It is clear that Plaintiffs have not complied with either Tennessee Rule of Appellate Procedure 27 or Tennessee Court of Appeals Rule 6 concerning their issues of unjust enrichment, constructive trust, and de facto merger. We agree with Defendants that Plaintiffs' argument concerning these issues is insufficient on appeal. It is not acceptable on appeal merely to provide citations to the record of various responsive motions or others filings from the proceedings below where your position was presented to the Trial Court without developing an argument on appeal as to how the Trial Court erred in its ruling concerning those motions. Plaintiffs' brief on these issues is entirely devoid of what is required by our rules on appeal. As this Court has stated, "[t]he failure of a party to cite to any authority or to construct an argument regarding his position on appeal constitutes waiver of that issue." *Newcomb v. Kohler Co.*, 222 S.W.3d 368, 401 (Tenn. Ct. App. 2006). Therefore, Plaintiffs' failure to comply with Tennessee Rule of Appellate Procedure 27 and Tennessee Court of Appeals Rule 6 has resulted in waiver of those issues on appeal. That portion of the Trial Court's judgment regarding the issues of unjust enrichment, constructive trust, and de facto merger is affirmed.

We note that Defendants include the claim of accounting in their statement of the issues concerning whether Plaintiffs have waived their appeal of the issue. However, they have not included the claim of accounting in their argument section related to the waiver issue. In their brief, Defendants request only that this Court "hold that Plaintiffs waived their challenge to the dismissal of their claims of unjust enrichment, de facto merger, and constructive trust."

The Trial Court stated in its oral ruling, which was incorporated into its judgment, that it was dismissing the claim of accounting as moot. As the trial court stated, the claim of accounting is an equitable remedy for preserving assets and is related to Plaintiffs' claim of implied partnership. If Plaintiffs ultimately are successful on the claims remanded to the Trial Court, an accounting may well be necessary. If Plaintiffs ultimately are not successful on those claims on remand, no accounting will be necessary. Based on the relation of the claim of accounting to the implied partnership claim, we reverse the Trial Court's grant of summary judgment concerning the requested accounting and remand to the Trial Court for further proceedings as necessary concerning this issue.

## Conclusion

Based on the foregoing, we affirm the Trial Court's judgment granting summary judgment in favor of Defendants for the claims of unjust enrichment, constructive trust, and de facto merger. However, we reverse the Trial Court's grant of summary judgment in favor of Defendants concerning the statute of limitations, implied partnership, and accounting. This cause is remanded to the Trial Court for further proceedings consistent with this Opinion. The costs incurred on appeal are assessed fifty-percent against the appellants, Sharon Kay Story and Mary Helen Meadows, in their capacity as co-trustees of Meadows Community Property Trust, and The Meadows Community Property Trust, and fifty-percent against the appellees, Mark Steven Meadows; Nashville Ready Mix, Inc.; Nashville Ready Mix of Murfreesboro, Inc.; Nashville Ready Mix of Columbia, LLC; Nashville Ready Mix of Franklin, LLC; Nashville Ready Mix of Clarksville, LLC; Nashville Ready Mix of Dickson, LLC, and Nashville Ready Mix of West Nashville, LLC.

_____
D. MICHAEL SWINEY, CHIEF JUDGE